I

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IAN MCFARLAND,

             Petitioner,                          No. CIV S-08-1165 JAM CHS P

    vs.

D.K. SISTO,

             Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner McFarland is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  Petitioner is currently serving an indeterminate sentence of life in prison following his 1989 convictions for attempted robbery and first degree murder.  In the pending petition, petitioner challenges the execution of his sentence, and specifically, the decision of the Board of Parole Hearings following his second parole suitability hearing, held on December 19, 2006, that he was not suitable for parole.  After a thorough review of the record and applicable law, it is recommended that the petition be granted.

## II.  BACKGROUND

On June 19, 1987, victims Jesse Cole, Richard Clay, and Jeffrey Richardson, Marines stationed at 29 Palms, went into town to celebrate their recent graduation from

1

communications and electronics school.  They rented a room at the El Rancho Motel.  Around

10:00 p.m. that night Richardson and Clay decided to go to a local bar.  Cole, who was under 21,

stayed at the motel.  Clay and Richardson met Jamette Misener on the street and started talking

with her.  She invited them to come with her and her friend Adrianna Medezma to a

housewarming party, and they agreed to go.  They all got into a truck and went to the motel to

pick up Cole.  After picking up Cole, Jamette drove the five of them out to an abandoned house.

Petitioner and his co-offenders, Richard Misener, Jerry Givens, Bradley Bork, Terry Gump, were

waiting outside the abandoned house.

              At trial, Richard Misener testified that the group had met earlier that evening at

Givens's house.  Givens and Richard Misener started talking about committing a robbery by

using the girls to lure some Marines out to an abandoned house.  Neither petitioner nor Gump

participated in the conversation at first, and at one point petitioner started to leave.  Richard

Misener started "leaning on him," however, and petitioner agreed to go along with the others.

Later, after they reached the abandoned house, petitioner and Bork wanted to leave but Richard

Misener started "leaning on them again, and they finally gave in."

              When Jamette Misener and Medezma arrived at the house with Clay, Cole, and

Richardson, Jamette went into the house with Cole and Clay while Medezma and Richardson

stayed outside.  Richard Misener was standing near the garage holding a loaded shotgun along

with petitioner and Bork, who were also holding loaded guns.  Cole heard someone say "hold it"

or "freeze."  About the same time, Cole and Clay started to go back outside when they heard a

gunshot.  Clay started running outside and noticed that Richardson was running near him but

appeared to trip and fall.  Clay continued running into the desert and managed to escape.  When

Cole heard the gunshot, he turned and ran toward the rear bedroom attempting to escape out a

window.  About the same time he heard someone yell, "Stop or I'll kill you," and saw someone

holding a shotgun.  Cole later identified Misener as the one that told him to stop.  Cole was

forced to crawl on his hands and knees to the bathroom where someone searched his pockets.

1  Misener then told Cole to crawl outside into the truck.  Misener drove Cole to an isolated area in

2  the desert and released him with instructions not to contact the police.  Cole flagged down a truck

3  and was taken to the Joshua Tree station where he reported the crime.  Meanwhile, Clay was able

4  to reach town and contact the police.  Clay returned to the abandoned house with police where

5  they found twenty-one year old Richardson shot dead. Officers obtained a description of the

6  pickup truck which led to the arrest of petitioner and his co-offenders.

7          In a tape recorded interview, petitioner stated he was backup in the attempted

8  robbery and did not intend to use his loaded shotgun unless "something came down like one of

9  them having a pistol or something."  Petitioner maintains that he heard two shots fired that night

10  and saw two muzzle flashes coming from different areas, but thought the shots were fired into

11  the air.  He claims he left the scene on his motorcycle, unaware that one of the victims had been

12  shot, and that he did not find about the murder until he was apprehended the next day.

13          At trial, the prosecutor contended Richardson was shot by Misener, but there was

14  also evidence which would suggest that Givens shot him.  There was no evidence to suggest that

15  petitioner shot Richardson.  Pursuant to the felony murder rule, petitioner was convicted by jury

16  of first degree murder and multiple counts of attempted robbery.  It was further found, for

17  enhancement purposes, that petitioner was armed with a deadly weapon.  Petitioner was

18  sentenced to 26 years to life in state prison.

19          Petitioner's life term began in 1989 and his minimum eligible parole date passed

20  on February 15, 2005.  On December 19, 2006, a panel of the Board of Parole Hearings

21  ("Board") conducted a first subsequent (second overall) parole suitability hearing to determine if

22  petitioner would pose an unreasonable risk of danger or threat to society if released from prison,

23  and thus whether he was suitable for parole.  Citing circumstances related to petitioner's

24  commitment offense and various other factors, the Board determined that petitioner was not

25  suitable for parole.

26  /////

1    Petitioner challenged the Board's decision in a petition for writ of habeas corpus

2    to the San Bernardino County Superior Court.  The San Bernardino County Superior Court

3    denied his claims in a brief written decision dated November 29, 2007.  The California Court of

4    Appeal, Fourth District, likewise denied relief, and the California Supreme Court denied review.

5                                    III.  ISSUE PRESENTED

6    In two separate claims petitioner argues that Board's decision to deny parole

7    violated his right to due process of law because (1) the decision was not supported by "some

8    evidence" in the record nor was there a rational link or nexus between the conclusion reached

9    and the evidence cited; and (2) he meets 7 out of 9 circumstances tending to show parole

10   suitability and cannot comply to any greater degree with them.  Since the allegations in

11   petitioner's claims both assert due process violations in relation to the sufficiency of evidence

12   supporting the Board's parole decision, they will be addressed together herein as a single issue.

13              IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

14   An application for writ of habeas corpus by a person in custody under judgment of

15   a state court can be granted only for violations of the Constitution or laws of the United States.

16   28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

17   *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

18   This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

19   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

20   U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

21   AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

22   state court proceedings unless the state court's adjudication of the claim:

23        (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
24        determined by the Supreme Court of the United States; or

25        (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
26        State court proceeding.

                                         4

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).  This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

## V.  DISCUSSION

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, in and of itself, create for prisoners a protected liberty interest in receipt of a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If a state's statutory parole scheme uses mandatory language, however, it creates "a presumption that parole release will be granted," thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).  California's statutory scheme for determining parole for life-sentenced prisoners provides, generally, that parole shall be granted "unless consideration of the public safety requires a more lengthy period of

5

1   incarceration." Cal. Penal Code §3041. This statute gives California state prisoners whose

2   sentences carry the possibility of parole a clearly established, constitutionally protected liberty

3   interest in receipt of a parole release date. *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007)

4   (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*,

5   334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; *Allen*, 482 U.S. at 377-78

6   (*quoting Greenholtz*, 442 U.S. at 12)).

7           Despite existence of this liberty interest, the full panoply of rights afforded a

8   defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

9   proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme

10  Court has held that a parole board's procedures are constitutionally adequate if the inmate is

11  given an opportunity to be heard and a decision informing him of the reasons he did not qualify

12  for parole. *Greenholtz*, 442 U.S. at 16.

13          Additionally, as a matter of California law, denial of parole to state inmates must

14  be supported by at least "some evidence" demonstrating future dangerousness. *Hayward v.

15  Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Rosenkrantz*, 29 Cal.4th

16  616 (2002), *In re Lawrence*, 44 Cal.4th 1181 (2008), and *In re Shaputis*, 44 Cal.4th 1241

17  (2008)). "California's 'some evidence' requirement is a component of the liberty interest

18  created" by the state's parole system. *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). The

19  federal Due Process Clause requires that California comply with its own "some evidence"

20  requirement. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam). Accordingly,

21  the United States Court of Appeals for the Ninth Circuit has held that a reviewing court such as

22  this one must "decide whether the California judicial decision approving the... decision rejecting

23  parole was an "unreasonable application" of the California 'some evidence' requirement, or was

24  "based on an unreasonable determination of the facts in light of the evidence." *Hayward*, 603

25  F.3d at 562-63. This analysis is framed by California's own statutes and regulations governing

26  parole suitability determinations for its prisoners. *See Irons*, 505 F.3d at 851.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. §2402(b).  The regulation also sets forth specific circumstances which tend to show unsuitability or suitability for parole:

> (c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
>
> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner....
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.
>
> (d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of

circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Regs. § 2402(c)-(d).

The overriding concern is public safety and the proper focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. Thus, the applicable standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008). In other words, there must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a

8

threat to public safety.  *In re Lawrence*, 44 Cal. 4th at 1227.

At petitioner's 2006 parole suitability hearing, the Board recognized that some regulatory factors tended to show that he was suitable for release.  Aside from the commitment offense, petitioner's criminal record is free of any convictions or arrests as a juvenile or adult. Petitioner dropped out of school at age 17 to join the Marine Corps and was still in the service at the time of his arrest.  He later earned his GED in prison in 1984 and studied several vocations, including lens lab, auto mechanics, masonry, and graphic arts.  Petitioner completed at least two of those vocations, masonry and the lens lab program, and became a certified optician in 2000. At the time of the 2006 hearing he was studying to take an associate certified electronics exam. Petitioner also participated in self-help therapy during his incarceration.  The Board focused mainly on what petitioner had accomplished since his last suitability hearing two years prior. During that period of time, petitioner participated in AA/NA, completed a stress and anger management program, obtained a bible study certificate through Christian Certified, and joined the Veteran's group.  At the time of the hearing, he had not received a disciplinary report since 1991, when he was disciplined for "excess material, blocking."  The most recent psychological evaluator had opined that petitioner "expresses a mature level of remorse."  The Board further noted its factual finding that petitioner had marketable skills and realistic plans for his parole. Those plans included a job offer with an uncle and an offer by his mother to pay his rent.[1]

Nevertheless, the Board concluded that petitioner was not suitable for parole.  In finding petitioner not suitable for parole, the Board explicitly relied on the nature and gravity of his commitment offense.  The Board appeared to consider a few additional factors, but did not explicitly state whether it was relying on these other factors to support its decision.  In this regard, the Board noted petitioner's prison record reflected some misconduct, and that his most recent psychological report was "not totally supportive of release."  The Board also noted for the

---

[1] It was noted that although most of petitioner's family and friends live in the state of Washington, he is required by law to begin his parole term in the state of California.

1  record that a representative from the San Bernardino County District Attorney's office had

2  appeared to oppose the granting of parole.

3           On state habeas corpus review, the San Bernardino County Superior Court upheld

4  the Board's denial of parole against petitioner's due process challenge, finding that the

5  circumstances of his commitment offense alone supported the Board's conclusion:

> The court has reviewed the record of the proceedings in its entirety
> and finds that the board considered the criteria it is required to
> consider in making its decision as set forth in In re Rosenkrantz
> (2002), 29 Cal 4th, 616.  At this point in time, the definitive word
> on the area of law controlling judicial review of the Board of
> Parole Hearing's decisions denying a finding of suitability of
> parole has been made by our Supreme Court in the cases of In re
> Rosenkrantz (2002), 29 Cal 4th, 616 and In re John E. Dannenberg,
> (2005), 34 Cal 4th, 1016.  Penal Code §3041(b) provides for parole
> review of inmates such as Petitioner and further provides that such
> inmates shall be given a release date unless the board determines
> that the gravity of the current convicted offense is such that a
> consideration of the public safety requires a more lengthy period of
> incarceration.  California Code of Regulations, Title 15, Section
> 2402(a)(b)(c)(d) sets forth the rules by which the board is to make
> its determination.  As stated by the court, parole applicants have an
> expectation of being granted parole unless the board finds in the
> exercise of its discretion that the applicant is unsuitable.  The
> operative words are "in the exercise of its discretion".  Judicial
> review of this discretion is limited only to a determination of
> whether there is "some evidence" in the record to support the
> decision.  As held by the Supreme, this standard of "some
> evidence" is extremely differential [sic].  At bench, the board
> found the conduct of Petitioner to be extremely cruel and callous.
> The decision of the board notes that Petitioner and an accomplice
> lured several marines to an isolated area for the purpose of robbing
> them.  The Petitioner in his statement to the board admitted as
> much.  There were multiple victims of the robbery and one was
> killed during the course of the robbery.  The board further noted
> that the victims were unarmed and in essence ambushed.
>
> In making its decision the board also noted Petitioner's lack of a
> prior criminal record and support for release in his most recent
> psychological evaluation.  Positive factors favoring release were
> considered.  At bench, the record supports that the act[s] of the
> Petitioner were sophisticated beyond that which would normally be
> required to commit a murder.  At bench, the court is prohibited
> from conducting an independent assessment of the merits or
> considering whether the substantial evidence supports the findings
> of the board and its underlying decision.  The board is required to
> consider the Petitioner's background, his institutional participation,

10

1    post parole plans as well as a psychological evaluation.  Here this
     was done.  As our Supreme Court said, the nature of the inmate's
2    offense, <u>alone</u> could constitute a sufficient basis for denying parole.
     A review of the record supports the finding that there was "some
3    evidence" which led the board to its finding of unsuitability of
     Petitioner for parole.  Again, as our Supreme court has said, that
4    evidence need only be a "modicum" of evidence.  As stated earlier,
     the board did look at the positive factors that favored parole.  The
5    decision does not reflect a weighing process of the board, however,
     the <u>Rosenkrantz</u> court at page 677, clearly states that the board
6    need not explain its decision or the precise manner in which the
     specific facts were relevant to parole suitability.  This
7    consideration in balancing lay within the discretion of the board.
     The petition for Writ of Habeas Corpus is denied.

8

9    (*In re Ian McFarland*, No. WHCSS0700330, Order Denying Petition at 2-3 (San Bernardino

10   County November 29, 2007).

11          Thus, in finding that petitioner was not suitable for parole, both the Board and the

12   state court relied on the nature and gravity of his commitment offense.  As the state superior

13   court indicated, the nature of a prisoner's offense can by itself constitute a sufficient basis for

14   denying parole in some instances.  *In re Rosenkrantz*, 29 Cal.4th at 682.  Under the applicable

15   state regulations, factors relating to a commitment offense tend to show unsuitability for parole

16   where (A) multiple victims were attacked, injured or killed; (B) the offense was carried out in a

17   dispassionate and calculated manner, such as an execution-style murder; (C) the victim was

18   abused, defiled or mutilated; (D) the offense was carried out in a manner which demonstrates an

19   exceptionally callous disregard for human suffering; or (E) the motive for the crime is

20   inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs. §2402 (c)(1)(A)-(E).

21          Here, the Board accurately noted with respect to the offenses committed by

22   petitioner and his crime partners that multiple victims were attacked.  The Board also found that

23   the offense was carried out in a manner which demonstrated an exceptionally callous disregard

24   for human suffering.  In so finding, the Board described how the victims were lured to the scene

25   and then ambushed upon their arrival by armed individuals who were lying in wait.  Petitioner's

26   crime appears to meet the regulatory description for one that is especially aggravated.

1    Nevertheless, it is questionable whether petitioner's offense was committed in a manner that was

2    so heinous, atrocious or cruel that it continued to demonstrate his unsuitability for parole nearly

3    20 years later, at the time of the 2006 parole suitability hearing.

4              As the California Supreme Court clarified soon after the San Bernardino Superior

5    Court issued the last reasoned decision addressing petitioner's due process claim, "[i]t is not the

6    existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole

7    decision; the significant circumstance is how those factors interrelate to support a conclusion of

8    current dangerousness to the public." *Lawrence*, 44 Cal.4th at 1212.  Thus, the proper

9    consideration is not whether petitioner committed acts that exceed the elements of first degree

10   murder, but rather, whether some evidence in the record supports the Board's determination that

11   the offense was especially aggravated *and* that the aggravated nature of the offense indicates that

12   petitioner poses a current risk to public safety.  *Id*. at 1228; *In re Shaputis*, 44 Cal.4th at 1259.

13             Here, there is no evidence that petitioner shot Richardson, nor evidence of

14   premeditation, calculation, or deliberation on petitioner's part with respect to the shooting.  *Cf.*

15   *Biggs*, 334 F.3d at 912, 916 (where inmate up for parole had refused to actually kill the victim

16   but had agreed to be involved in the ruse to murder him, was present during the murder, paid

17   money to the co-conspirators, and returned with the killer in an attempt to better conceal the

18   body, the Ninth Circuit noted "Biggs did not commit the murder himself, [but] he was

19   intertwined with the conspiracy from the very beginning").  There is no evidence that petitioner

20   abused, mutilated, or tortured any of the victims or inflicted prolonged physical pain.  As the

21   Board noted, petitioner's motive was a "planned robbery gone bad."  This motive is, of course,

22   extremely trivial in relation to the taking of a human life, but perhaps not more trivial than

23   typical for a person convicted of murder in the first degree.  *See In re Scott*, 119 Cal.App.4th 871,

24   893 (1st Dist. 2004) (reasoning that all motives for murder could reasonably be deemed "trivial"

25   and concluding that in order to fit the regulatory description, the prisoner's motive must have

26   been more trivial than those which conventionally drive people to commit the offense in

1    question).  Moreover, petitioner's motive in this case, to rob the victims, applies more to the

2    underlying felony than to the murder of Richardson.  In any event, petitioner's motive was not so

3    unintelligible that it demonstrates that he may be "unusually unpredictable and dangerous,"

4    compared to other convicted murderers, which is the usual reasoning behind a finding with

5    respect to this factor.  *See Id*.  Moreover, without minimizing the seriousness of the crime

6    petitioner committed, the fact that multiple victims were involved does not, by itself, support a

7    finding that he was still too dangerous to be released in 2006.

8            In sum, both the Board and the state court failed to articulate how the presence of

9    one or more regulatory factors regarding petitioner's offense continued to demonstrate that he

10   still posed a risk of danger to public safety nearly two decades later, in 2006.  There is no clear

11   nexus between the facts of petitioner's offense, which meets the regulatory guidelines for one

12   that is especially aggravated, and his potential for future violence or criminality.  In this case,

13   petitioner's offense does not, by itself, tend to show that he is unusually dangerous and that the

14   implications of his dangerousness derived from the circumstances of the offense remained

15   probative at the time of the Board's denial of parole.  Accordingly, because the state superior

16   court cited only petitioner's conduct during the commitment offense to affirm the Board's denial

17   of parole, the last reasoned state court decision was "based on an unreasonable determination of

18   the facts in light of the evidence.'"  *Hayward*, 603 F.3d at 563 (quoting 28 U.S.C. §2254(d)(2)).

19   In order for petitioner to be entitled to relief, however, there must not be some other evidence in

20   the record that would support the Board's denial of parole.

21           It appears that the Board might have relied on petitioner's most recent

22   psychological report, prepared by Dr. Van Couvering, as a factor demonstrating unsuitability.

23   Although the state superior court indicated the Board had noted "support for release in

24   [petitioner's] most recent psychological evaluation," the Board actually commented specifically

25   that the report was "not totally supportive of release."  The psychological evaluator had

26   concluded in the report that petitioner's "risk of future violence in the community appears to be

                                                   13

low." As the Board noted, however, the report also indicated with respect to an estimate of petitioner's future dangerousness in the community that the most significant risk factor would be the risk of intoxication on drugs or alcohol. Placing this statement in its proper context within the report and in context of other factors in the record, however, it does not constitute some evidence that petitioner was not suitable for parole in 2006.

At his 2006 parole suitability hearing, petitioner stated that he began experimenting with drugs when he was 12 or 13 years old. He admits previous use of alcohol, marijuana, and LSD. The probation officer's report, prepared in 1989 prior to sentencing, indicated that petitioner used LSD and drank beer prior to the commitment offense. At the 2006 parole suitability hearing, petitioner admitted that he drank "a couple of beers" that day but denied using drugs prior to committing the offense.[2] The section of petitioner's psychological evaluation entitled "Estimated Dangerousness" addresses his substance abuse history and prognosis, and provides as follows:

> **Estimated Dangerousness:**
>
> **Prior crime history, pattern of violence:** This was the inmate's first crime. He has no prior record.
>
> **In prison: History during this incarceration:** The inmate received 128s for smoking and obstructing the view into the cell (two). He received one 115 on 12/13/90 for inmate manufactured alcohol. His cellie later admitted that he was the one who had been manufacturing the alcohol and that the inmate himself had not been involved. On January 31, 1991, he received another 115 for excessive material blocking view into the cell. This is the extent [] of the disciplinary actions against him. During his incarceration , it must be noted that he has engaged in constructive activity. He has learned auto mechanics, graphic arts, masonry, and has become a certified optician.
>
> **Estimated Future Violence in the Community:** The inmate was 19 years old at the time of the crime, was enlisted in the Marine Corps and was subjected to some peer pressure to participate. This

---

[2] Petitioner claims that he admitted to the probation officer that he had experimented with LSD on prior occasions, but maintains that the probation officer's written summary indicating that he used LSD on the day of the offense was error.

1       was his first crime.  There have been no subsequent episodes of
    violence.  He appears to have normal maturation, with a world
2       view appropriate to his 36 years.  The most significant risk factor
    would appear to be intoxication on alcohol or drugs.  The inmate
3       indicated he was through experimenting with intoxicants.  There is
    no indication that he has been using controlled substances in
4       prison.  He has become involved in constructive, self-improvement
    activities.  Taking the above factors into account, risk of future
5       violence in the community appears to be low.

6   (Psychological Evaluation for the Board of Prison Terms by Dr. Nancy Van Couvering, undated,

7   at 4.)

8       While incarcerated, petitioner took substance abuse curriculum in 2002 and

9   participated in AA/NA in 2005 and in 2006 after being requested to do so by the panel of the

10  Board that presided over his initial parole suitability hearing.  At the 2006 parole suitability

11  hearing, he indicated that he knew and practiced the 12 steps of the AA/NA programs.  Under the

12  circumstances of this case, the statement in the psychological evaluation that alcohol or drugs

13  were petitioner's highest "risk factor" does not constitute some evidence that he was too

14  dangerous to be released on parole.  There is some evidence that petitioner abused drugs and

15  alcohol in the past, however, there is no indication that this evidence remained probative to a

16  determination of his current or future dangerousness in 2006, given the other factors in the record

17  demonstrating rehabilitation.  "What *does* constitute [probative] evidence is [petitioner's]

18  abstention from alcohol throughout the... years prior to his parole hearing, as well as his

19  impeccable disciplinary record in prison, both of which are highly probative of his attitude

20  towards alcohol and his capacity for self-discipline."  *Pirtle v. Cal. Bd. Of Prison Terms*, 611

21  F.3d 1015, 1024 at n.7 (9th Cir. 2010) (emphasis in original) (holding also that "[b]ecause there

22  is no evidence that [petitioner] will be unable or unwilling to manage his alcohol problem

23  effectively upon release, as he has already done for more than two decades, we agree with the

24  district court that "the record does not support the panel's determination that petitioner's

25  [previous] abuse of alcohol... rendered him dangerous [at the time of the parole suitability

26  hearing]."  *Pirtle*, 611 F.3d at 1024.

1        Petitioner's substance abuse prior to incarceration does not constitute some

2  evidence to support the Board's denial of parole.  Nor does any other information contained in

3  the psychological evaluation demonstrate some evidence of his unsuitability.  As the state

4  superior court found, the psychological report was actually supportive of petitioner's release.

5  The fact that the evaluator identified intoxication as petitioner's highest risk factor is not some

6  evidence of unsuitability.  To any extent the Board relied on this statement in the psychological

7  report as some evidence that petitioner was not suitable for parole, that reliance was arbitrary and

8  violated his right to due process of law.  To the contrary, on this record, any conclusion that

9  petitioner still posed a risk of future danger because he might potentially resume drinking and

10  using drugs would be speculative, and not based on actual evidence in the record.

11        In giving its decision, the Board took note that petitioner had been disciplined for

12  some misconduct in prison, but did not specifically state whether it was relying on this previous

13  misconduct to support the denial of parole.  Under the circumstances of this case, reliance solely

14  on such misconduct would be a violation of due process.  Petitioner's misconduct in prison was

15  non-violent and limited to two instances of "excessive blocking" (i.e., obstructing security

16  officers' view into the cell) and one instance of manufacturing alcohol, all in the first two or

17  three years of his incarceration.  Importantly, according to the psychological evaluation,

18  petitioner's cell mate at the time claimed responsibility for the alcohol manufacturing offense and

19  there is no indication that petitioner was involved.  Moreover, since 1991, petitioner has been

20  free of discipline.  According to the psychological evaluator, there is no evidence that petitioner

21  ever used controlled substances in prison.  On this record, petitioner's misconduct which

22  occurred near the beginning of his incarceration, approximately 15 years prior to the parole

23  suitability determination at issue, did not constitute some evidence of current or future

24  dangerousness in 2006.

25         Finally, as noted earlier, the Board stated in its decision that a representative from

26  the San Bernardino County District Attorney's office had appeared to oppose the granting of

16

1   parole.  It was not clear whether the Board intended to rely on such opposition to support its

2   decision or whether it was simply noting the representative's statement for the record.  In any

3   event, such opposition was properly noted and considered (*see* Cal. Pen. Code, § 3046(c)),

4   however, it does not constitute some evidence of petitioner's unsuitability.  *See In re Shippman*,

5   185 Cal.App.4th 446, 482 (1st Dist. 2010) ("The District Attorney's 'opinion'... is not evidence,

6   and therefore does not constitute 'some evidence' supporting the... decision") (*quoting In re*

7   *Dannenberg*, 173 Cal.App.4th 237, 256 at n.5 (6th Dist. 2010)).

8               As discussed herein, the proper consideration in the suitability determination is

9   whether the inmate poses a current or future threat to public safety.  In this case, however, there

10  is no reliable evidence in the record before the Board and this court that petitioner posed an

11  unreasonable risk of danger or threat to public safety at the time of the 2006 suitability hearing.

12  The circumstances of his commitment offense do not, in this case, provide the required evidence

13  to support the Board's 2006 denial of parole because there is no rational nexus demonstrating

14  that those circumstances remained probative in 2006.  The remaining factors that the Board

15  appeared to rely on were either unsupported by actual evidence or not rationally related to a

16  determination of petitioner's current or future dangerousness.  Accordingly, the Board's denial of

17  parole following the December 19, 2006 parole suitability hearing violated petitioner's right to

18  due process of law.

19                                      V.  CONCLUSION

20              For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

21  application for writ of habeas corpus be granted, and that a writ of habeas corpus issue directing

22  respondent, within 30 days, to calculate petitioner's release date as if he had been found suitable

23  for parole at the December 19, 2006 hearing, and to release him from custody in accordance with

24  that calculation.  *See Pirtle*, 611 F.3d at 1025 ("ordering the release of a prisoner is well within

25  the range of remedies available to federal habeas courts").

26  /////

1    　　　　These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

3    one days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within seven days after service of the objections.  Failure to file

7    objections within the specified time may waive the right to appeal the District Court's order.

8    *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

9    1991).

10   DATED: October 13, 2010

11                                                          CHARLENE H. SORRENTINO
                                                           UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18